WILKINSON *et al.*, Appellants, *vs.* THE AMERICAN IRON MOUNTAIN COMPANY, Respondent.

1. Neither by the Spanish law nor by the custom of Paris did a royal grant or gift to either of two spouses enter into the community.
2. The same rule applied to concessions in Louisiana, unless when made upon a consideration which was a burden on the community.
3. A marriage contract, entered into at Ste. Genevieve in 1797, contained this clause: "The intended consorts shall be in community as to all property and real estate acquired during marriage, according to and in conformity with the custom of this place, according to which their community shall be regulated, &c. *Held,* the words "according to and in conformity with the custom of this place" referred to the *community,* and not to the acquisition of property, and the clause did not have the effect to bring into the community, property which would otherwise not be embraced by it.
4. The operation of a clause in a marriage contract, *establishing* a community, cannot be enlarged by a subsequent clause providing for a *renunciation* of it.

*Appeal from St. François Circuit Court.*

This was an action brought in 1852 by six of the eleven children and heirs of Marie and Joseph Pratte, to recover an undivided three-elevenths of 20,000 arpens of land on the head

waters of the St. François river, known as the Iron Mountain tract, confirmed to Joseph Pratte by act of congress of July 4th, 1836.

The plaintiffs claimed in right of their mother, under a marriage contract entered into by the said Joseph and Marie, shortly before their marriage, dated Ste. Genevieve, February 4, 1797, which was claimed to have the effect to establish a community between them as to the land in controversy, subsequently conceded to the husband by the Spanish authorities. The defendant claimed the whole tract under conveyances from Joseph Pratte and his wife during their life time, but not properly acknowledged to operate upon the wife's community interest, if she had any, and if her husband was not competent to convey it. A translation of the marriage contract was annexed to the plaintiffs' petition, the original being in the French language. The following are its provisions, as translated in the record, so far as they bear upon the questions in this case :

"The intended consorts shall be in community as to all personal property and real estate acquired during marriage, according to and in conformity with the custom of this place, according to which their community shall be regulated, although they might hereafter live or acquire property in countries (governed by) contrary laws, usages and customs, which they do by these presents expressly renounce and disclaim."   *   *   *

"The intended consorts take each other with the claims to them belonging, whether due or to become due, coming to them from their respective fathers and mothers, in whatever places they may be situated. Those of the intended husband consisting now of 3000 livres due to him out of the inheritance of his deceased mother, which his father promises to pay him immediately after the celebration of the said marriage, shall enter into the mass of the said community. And those of the intended wife, consisting of five thousand livres, as her portion and advance on inheritance, which her father and mother promise also to pay her after the celebration of the said marriage, shall also enter into the said community."   *   *   *   *   *

"In consideration of the marriage, the said intended husband has endowed and does endow the said intended wife with the sum of five hundred livres of *prefixed* (prefix) dower, to be paid over, to be had and taken as soon as she has a right to it, out of all the personal and real property, present and to come, of the said intended husband, who has pledged and mortgaged the same, for the purpose of furnishing and securing the said dower, which the said intended wife shall enjoy and possess according to the custom of this place, without her being obliged to sue for it. The survivor of the said intended consorts shall take by *preciput;* and before making any division of the property belonging to their community, the sum of two hundred and fifty livres in personal property of the said community, according to the appraisement of the inventory and without overrating ; the said sum (to be paid) in cash at his (survivor's) choice and option."

"It shall be allowed to the said intended wife and to the children who may be born of said marriage, by renouncing the said community, to take back all that she will have brought to said marriage, and that which shall have come and befallen to her during said marriage, whether it be personal or real property, by inheritance, donation, bequest or otherwise; and the said intended wife, if she survives, (shall have a right to take) her dower and *preciput* (or jointure) as above (specified,) the whole being free and clear of all debts and mortgages of the said community, although she might have spoken in the same, bound herself or been condemned to (pay said debts and mortgages) for which, in such case, she and her children shall be *acquitted* and indemnified on the property of the said intended husband, on which property, for this reason and for the fulfillment of all the clauses and conditions of the present contract, there shall be a mortgage from this day."   *   *   *

It appeared that this marriage contract was never recorded, as required by the act of December 22, 1824.

On the 28th of September, 1797, after his marriage, Joseph Pratte addressed to Don Zenon Trudeau, lieutenant governor

of Upper Louisiana, a petition for a grant of 20,000 arpens of land on the waters of the St. François river, stating that he wished to form a settlement, and that the lands asked for were "suitable to his views, as well for agriculture, as for the raising of a great quantity of cattle, with which he is well provided," and that the quantity asked was "proportionate to his strength and means for improving them." It was found by the Circuit Court that Joseph Pratte applied for this concession at the instance of his wife's father, Francis Valle. Valle had previously obtained a grant for 400 arpens, including the Iron Mountain, and desiring to procure a larger quantity for the benefit of his children, and fearing that he could not do so in his own name, he procured his son-in-law, Pratte, to apply for and obtain a concession for the 20,000 arpens, including the 400 arpens before granted to him, which he relinquished. Pratte was to hold the land for the benefit of himself and Valle's other children in equal shares.

On the 17th of October, 1797, the lieutenant governor ordered the surveyor to survey the land asked for by Pratte, and deliver to him a plat and certificate of the survey, to serve him as a title, until a more formal title could be obtained from the governor general.

In December, 1811, Pratte presented his claim to the United States board of commissioners for confirmation, and it was rejected.

On the 2d of June, 1829, Pratte and wife, pursuant to the arrangement with Francis Valle before the concession, joined in a deed conveying to the other heirs of Francis Valle, the undivided six-sevenths of the tract in controversy. This deed was acknowledged before the clerk of the Circuit Court. The certificate stated that the wife acknowledged that she "executed the same freely and voluntarily, and relinquished her dower," &c., but omitted to state that she was made acquainted with the contents.

In 1834, Pratte's claim was, by the board of commissioners,

9—VOL. XX.

recommended for confirmation, and confirmed by the act of July 4, 1836.

On the 13th of February, 1837, Pratte and wife joined in a deed conveying to John L. Vandoren the undivided one-seventh of the tract. This deed was acknowledged before a judge of the county court, and the certificate stated that the wife " acknowledged that she executed the deed and relinquished her dower," &c. Marie Pratte died in 1841, and Joseph Pratte in 1846, leaving the plaintiffs and others their heirs at law.

All the title which passed by the two deeds from Pratte and wife, of June 2, 1829, and February 13, 1837, was in the American Iron Mountain company.

The Circuit Court declared that the grant of the land in controversy to Joseph Pratte vested in him the complete title, and that the same did not enter into the community established by the contract between him and his wife; and that, even if it did enter into the community, yet the husband, as the head of the community, could alienate it; and that therefore the plaintiffs could not recover. The case was argued in this court by Mr. Noell and Mr. Frissell, for appellants, and by Mr. Field and Mr. Young, for respondent. The following points were made :

Mr. *Noell* and Mr. *Frissell*, for appellants. 1. The concession of 1797 to Joseph Pratte was not a royal gift, but a grant founded on considerations which appear in the evidence before the board of commissioners. (4 Mart. N. S. R. 212.) 2. If such concession be a royal gift, still by the terms of the marriage contract, it went into the community. (*Fabre et al.* v. *Sparks*, 12 Rob. 31.) 3. The marriage contract in evidence this case was an authentic act, and a record under the Spanish in law, and imparted notice to all the world of its contents. (*McNair* v. *Dodge,* 7 Mo.) 4. The property in controversy having entered into the community while the Spanish law was in force in 1797, its character as community property was fixed, and the inchoate right of the mother of plaintiffs was vested, and all persons were bound to take notice of it; and the act of

1825, requiring marriage contracts to be recorded could not have the effect to divest rights, or to destroy the effect of notice which had already attached to the property, and by which all persons and parties were bound, and had been for twenty-eight years. 5. The law in force at the time of the marriage of Joseph Pratte and Marie Valle established the community upon the mere fact of marriage, independent of any contract; and as to all property acquired before the change of government, the community right attaches, and there is no notice in fact required as to the date of the marriage and the law in force fixing the wife's inchoate right in property acquired by the husband in his own name; but purchasers acquiring title from the husband stand on the same footing, as to notice, as the same class of persons do in reference to the wife's dower at common law or under the statute. 6. The deed of 1829 is insufficient, from the character and form of the acknowledgment, to pass any interest of the wife. 7. The facts do not establish a trust in favor of the grantees in the deed of 1829, and if a trust was established, it was in favor of all the heirs of Francis Valle, and the mother of plaintiffs, being one of them, was entitled to one-seventh of the land in her own right, which did not pass by the deed to Vandoren. 8. The concession being obtained through the influence and assistance of Francis Valle, the father of Mrs. Pratte, and she being the meritorious consideration of the concession thus obtained, according to the principles and spirit of the Spanish law, the property becomes paraphernal, and the husband could not convey it, even under the Spanish law.

Mr. *Field* and Mr. *Young*, for respondent. I. The marriage contract of Joseph Pratte and his wife, not having been recorded pursuant to the provisions of the act of 1824, was invalid as to the defendant being a *bona fide* purchaser without notice. (*Wilkinson* v. *Rozier*, 19 Mo. Rep.) II. The land conceded by the Spanish government to Joseph Pratte being a royal grant out of grace and favor, and not as a reward for services rendered or a price paid, did not enter into the community. 1.

Not by the rule of the Spanish law regulating community. (*Gayoso* v. *Garcia*, 1 Mart. N. S. 333. *Frique* v. *Hopkins*, 4 id. 214. *Rouquier* v. *Rouquier*, 5 id. 99. *Hughey* v. *Barrow*, 4 La. An. 250. Escriche, Dicc. Juris. Voc. Bienis gananciales.) 2. Not by the custom of Paris. (Chapin, Coût. de Paris, liv. 11, tit. 1, §12. Lebrun, Traité, de Comm. liv. 1, c. 5, §30 ) III. If the land in question were part of the community property, the deed of the husband was competent to convey it. (*Moreau* v. *Detchemendy*, 18 Mo. Rep. 522.) IV. The confirmation to Joseph Pratte individually merged all the rights of the wife arising under any antecedent law or contract of community ; and the purchaser under the husband acquired a perfect title. (*Guyol* v. *Chouteau*, 19 Mo. Rep. 546.)

GAMBLE, Judge, delivered the opinion of the court.

The first question presented by the parties in the discussion of this case is, whether the land granted by the Spanish authorities to Joseph Pratte came into the community established by the contract between him and his wife. If it did not, there is an end of the case, because the plaintiffs only claim under the wife of Joseph Pratte, upon the ground that it was property of the community.

We look to the petition which was presented to the lieutenant governor, and to that alone, to ascertain the grounds upon which Pratte applied for a concession, and when the order to put the party in possession of the land, made by the lieutenant governor upon the petition, suggests no other consideration for the grant than that contained in the petition, we find the motives and considerations upon which the concession was made to be just those set out in the petition. In the present case, the grant was a mere bounty, having no reference to the existence of the community.

A royal grant or gift to either of two spouses did not enter into the community of acquisitions and gains, which, under the Spanish law, resulted from the mere fact of marriage. (*Gay-*

*oso* v. *Garcia*, 1 Mart. N. S. 334. *Frique* v. *Hopkins*, 4 Mart. N. S. 212. 5 id. 98. *Hughey* v. *Barrow*, 4 Ann. L. R. 250.) In *Frique* v. *Hopkins*, the rule of the Spanish law is considered as applying to concessions made in Louisiana, and the application of the rule is made, upon consideration of the motives upon which such concessions were ordinarily given. If it appeared that the concession was made upon a consideration which was a burden on the community, the case would be an exception to the general rule. This concession or the land granted would not have come into the community created by law upon the marriage of Joseph Pratte and his wife.

The question then arises upon the construction of the marriage contract between Pratte and his wife, whether that contract had the effect of making it a part of the community property. The petition alleges that the contract is in the French language, and the original is not filed with the petition, but a paper is, which is called a translation, and which is treated throughout the trial as a correct translation.

The clause in it which establishes the community, is in these words: "The intended consorts shall be in community as to all personal property and real estate acquired during marriage, according to and in conformity with the custom of this place, according to which their community shall be regulated, although they might hereafter live or acquire property in countries governed by contrary laws, usages and customs, which they do by these presents expressly renounce and disclaim."

It is to be regretted that we have not the original of this contract in the record, for some of the terms employed in the translation, such as "personal property" and "real estate" satisfy us that it is rather a free translation, if the words of the original are those commonly used in such instruments, and in the argument of the case, the counsel have admitted that the words "acquets" and "conquets" are used in the original as a designation of the property brought into the community.

But we will consider the words used in the translation. The parties are to be in community as to all personal property and

real estate acquired during marriage, according to and in conformity with the customs of the place. What is to be according to and in conformity with the custom? Not the acquisition of the property certainly. Then it can only be the *community* in the personal and real property, which is to be according to and in conformity with the custom. The clause has the same meaning as if it read, " the parties shall be in community according to and in conformity with the custom of the place, in all personal property and real estate acquired during marriage." The words were arranged in the first clause of the sentence in the order in which they stand in the contract, simply because, in the latter clause of the sentence, the custom was to be declared the rule of the community in other countries, and by making the custom the last subject in the first clause, the second applies to the same subject, without any necessity for repetition of words, and without interrupting the train of ideas.

Taking this to be the meaning of the clause which establishes the community, we look only to the custom referred to, in order to ascertain what property came into the community, and in the absence of any special local custom, if we take either the custom of Paris, or the Spanish law to be the rule, a royal gift to either spouse does not belong to the community. It has been insisted that other clauses of this contract give a wider scope to that which creates the community.

The clause which brings into the community the money due to the husband out of the inheritance of his deceased mother, and that promised to the wife by her father, by way of advancement, if it be understood to bring to the community funds which, from their character as inheritance or donation, would not enter into the community as created by law, shows that the first clause, which established the community, was not understood to have the effect of bringing them in by its general terms. The argument then, from this clause, is legitimate, that it was deemed necessary to specify, as parts of the community property, that which was not of a description otherwise

to become such by law, and consequently a royal grant did not enter into it without a specification that would embrace it.

The clause providing for a renunciation of the community by the wife, or her children, is also supposed to afford a reason for giving to the community clause a construction which will bring within it the present property, although a royal gift. This clause allows the wife, upon a renunciation of the community, to take back all that she shall have brought into the marriage, without its being liable for the debts of the community, and giving a mortgage upon all the husband's property for the reimbursement of any sums she may have been obliged to pay, and for the general fulfillment of the clauses and stipulations of the contract. The argument is that, because she is allowed to take back all that she shall have brought to said marriage, " and all that shall have come and fallen to her during marriage, whether it be personal or real property, by inheritance, donation, bequest or otherwise ;" that, therefore, the community is to be held to include all property of every description.

A renunciation of the community is an abandonment of all claim under it, and places the parties in altogether different relations in respect to the property which they respectively possessed and the profits arising from its use during marriage. The language of this clause is in a common form, and does not contribute to give greater force or scope to that which fixes the extent of the community. The case of *Fabre* v. *Sparks*, 12 Rob. 31, gives no support to the construction here contended for. There, a marriage contract which created a community in all their estate, real and personal, "present and to come," stipulated that, upon the death of either party, without children of the marriage, the amount of " property brought into the community" should go to the surviving husband or wife. The question was, what property was embraced in this last clause in favor of the survivor, and it was held that all the property of each, " present and to come," being brought into the community, that was the property to which the survivor

was entitled, whether owned at the time of the marriage or subsequently acquired. In the present case, the attempt is to enlarge the operation of the principal clause establishing the community, by reference to another clause providing for a renunciation of the community. The latter clause cannot have this effect, nor, in fact, does it require us to give such force to its language, if it could legitimately so affect the first clause. The chief object of this latter clause is, to free the property of the wife, on a renunciation, from liability for the debts of the community, and give her a mortgage on her husband's property, so as to preserve to her the right of election at the dissolution of the community, either to abide by it and take her interests under it, or if that was not to her interest, then to take back her property without liability for debts, and so to stand preferred over all creditors, and also to have a mortgage for her security upon her husband's property.

Upon the whole, we think this property did not enter into the community, and therefore the plaintiffs are not entitled to recover. The judgment is, with the concurrence of the other judges, affirmed.